A.L. LABORATORIES, INC., Plaintiff,

v.

ENVIRONMENTAL PROTECTION AGENCY, Defendant.

CHEMICAL MANUFACTURERS ASSOCIATION, Plaintiff,

v.

Lee M. THOMAS, Administrator, United States Environmental Protection Agency, et al., Defendants.

Civ. A. Nos. 87–1991–OG, 87–2377–OG.

United States District Court, District of Columbia.

Nov. 23, 1987.

James Johnstone and Richard L. McConnell, Wiley, Rein & Fielding, Washington, D.C., for plaintiff A.L. Laboratories.

Robert Sussman and Scott Knudson, Latham & Watkins, Washington, D.C., for plaintiff Chemical Manufacturers Ass'n.

Caroline Wheling, E.P.A., and Daniel Pinkston, Dept. of Justice, Washington, D.C., for defendant EPA.

## MEMORANDUM

GASCH, District Judge.

These consolidated cases arise from the Environmental Protection Agency's ("EPA") denomination of approximately 400 substances as "extremely hazardous." Plaintiffs manufacture or represent the manufacturers of some of these sub-

stances.[1] The proximate effects of the appearance of a substance on this list include subjecting those who store sufficiently large quantities of the chemical to notification, reporting, and planning requirements under title III of the Superfund Amendments and Reauthorization Act ("SARA"). Pub.L. No. 99–499, §§ 300 *et seq.*, 100 Stat. 1613, 1728 (1986) ("Right-to-Know Act") (codified at 42 U.S.C.S. §§ 11001–11050 (Law. Co-op. 1987)).

Plaintiffs' complain that the substances that they manufacture were improperly included on the extremely hazardous substances list because of a clerical error or "seriously flawed" scientific methods. Although the EPA was notified of these alleged errors, the substances remain on the list. The plaintiffs seek declaratory and injunctive relief, enjoining enforcement of EPA rules that allegedly decline to delete these substances from the list and ordering that these substances be removed from the list.

*History of the "Extremely Hazardous Substances" List*

In November 1985, EPA compiled and published a list of 402 "Extremely Hazardous Substances" as part of its Chemical Emergency Preparedness Program ("CEPP list") the purpose of which is to help local governments identify chemicals that could have acute adverse health effects if released accidentally. *See* 51 Fed.Reg. 41,-572–73 (Nov. 17, 1986). The CEPP list was derived primarily from the Registry of Toxic Effects of Chemical Substances ("RTECS") created and maintained by the National Institute of Occupational Safety and Health. *Id.* at 41,574. Both bacitracin

and the phthalate esters were included on the list.

In October 1986, SARA was enacted and signed into law. Title III, the Right-to-Know Act, establishes a program to assist state and local governments in planning for accidental releases of extremely hazardous substances. 42 U.S.C.S. §§ 11001–11050 (Law.Co-op.1987). The Act provided that by November 17, 1986 the EPA would publish a list of substances ("Right-to-Know list") to which the program would apply and that the list would be the "same" as the CEPP list. The EPA published the list as a proposed rule, and bacitracin and the phthalate esters were included. 51 Fed. Reg. 41,593 (1986).

At the time that EPA published the proposed Right-to-Know list, it recognized that several of the listed substances "no longer [met] the original listing criteria" upon which both the CEPP and proposed Right-to-Know lists were based because of corrections to the RTECS data base. *Id.* EPA concurrently proposed, therefore, to delete these substances from the Right-to-Know list. Bacitracin and the phthalate esters were among the substances whose deletions were contemplated. *Id.* at 41,594.

On April 22, 1987, EPA published a final rule promulgating the Right-to-Know list upon which reporting and planning requirements would be based. 52 Fed.Reg. 13,378 (1987). Although EPA admitted the inaccuracy of the list, *id.* at 13,388, it decided not to delete any substances at that time. Persuaded by some comments to the proposed deletion, the EPA reasoned that section 11002(a)(4) of the Right-to-Know Act[2] precludes removal of any substance from

---

**1.** A.L. has been manufacturing and distributing bacitracin, one of the substances on the list, since 1976. The drug has been approved by the Food and Drug Administration for over-the-counter and prescription sales and for use as a feed supplement for livestock.

The Chemical Manufacturers Association is a non-profit trade association that represents several manufacturers of phthalate esters that appear on the list. The Association includes in its membership approximately 90% of the industrial chemical manufacturers in this country and between 50 and 60 producers or users of phthalate esters who are affected by the EPA's action in this case.

**2.** Section 11002(a)(4) states:

Revisions. The Administrator may revise the list and thresholds under [section 11002(a)(2) & (3) ] from time to time. *Any revisions to the list shall take into account the toxicity,* reactivity, volatility, dispersability, combustability, or flammability of a substance. For purposes of the preceding sentence, the term "toxicity" shall include any short- or long-term health effect which may result from a short-term exposure to the substance.

(Emphasis added).

the list until the EPA has determined that the substances pose no short- or long-term health hazards as a result of short-term exposure. Since the criteria for making such a determination are not available, EPA assigned bacitracin and the phthalate esters to the "level of lowest concern." [3] *Id.* The EPA has taken no other action as to these substances but insists that it is "actively reviewing the data" and that a proposed decision as to bacitracin will be published soon.

### The Designation of Bacitracin as an Extremely Hazardous Substance

Because of a clerical error, some data concerning bacitracin were incorrectly transcribed into the RTECS data base. The result of the error was to exaggerate the toxicity of bacitracin by a factor of more than 400. Relying on this overstated level of toxicity, the EPA included bacitracin on the CEPP list.

Citing the RTECS error, A.L. Labs wrote the EPA's Office of Toxic Substances in January 1986 to request that the list be corrected. In addition, the RTECS data base was amended that month, and this correction was reported to EPA with supporting documentation in early 1986. Apparently, no further action was taken by A.L. Labs or EPA until Congress enacted SARA and EPA promulgated the Right-to-Know list of extremely hazardous substances.

After the EPA declined to remove bacitracin from the Right-to-Know list, A.L. Labs petitioned the agency to have the deletion effected. At the same time, an RTECS official again notified EPA that the data base from which the CEPP and Right-to-Know lists were developed contained a clerical error regarding bacitracin. Subsequently, at a meeting between EPA and A.L. Labs representatives, the EPA acknowledged that bacitracin no longer qualified as an acutely toxic chemical but that section 11002(a)(4) precluded revision of the

Right-to-Know list until the long-term toxic effects of bacitracin had been studied.

Insisting that the EPA's actions have seriously harmed and will continue to harm the reputation of bacitracin, imposed inapposite regulatory burdens, and alarmed customers, A.L. Labs demands that the EPA be ordered to remove bacitracin from the Right-to-Know list.

### The Designation of Phthalate Esters as Extremely Hazardous Substances

The Chemical Manufacturers Association ("CMA") is a trade organization that represents the interests of the industrial chemical industry before a variety of governmental bodies. Among the chemicals manufactured by its members are phthalate esters that have been included on the Right-to-Know list. Like bacitracin, the phthalate esters appear on that list based on data compiled in the RTECS data base. This data was derived from a Russian article that was incorrectly translated for use by RTECS. A correct translation revealed that the author of that article had merely copied data from an uncited source. That source, in turn, contained internal inconsistencies and used units of measurement which undermine the reliability of the source. Based on this reevaluation of the Russian article, RTECS deleted the Russian source from the data base, thereby eliminating any basis for classifying the phthalate esters as acutely toxic. In addition to notifying EPA of the error in the RTECS data base, CMA cited other sources that allegedly establish that the phthalate esters are not acutely toxic.

Apparently aware that the phthalate esters were erroneously included on the Right-to-Know list, EPA proposed to delete the substances, just as it had proposed to delete bacitracin. The esters fared no better than did bacitracin; when the EPA issued its final rule, the esters were not

---

**3.** The regulatory scheme envisioned by the Right-to-Know Act requires EPA to assign a "threshold planning quantity" to each substance on the SARA list. 42 U.S.C.S. § 11002(a)(3) (Law.Co-op.1987). Any facility that stores a substance on the SARA list must comply with the disclosure and planning requirements of the Act if the amount stored at the facility exceeds the threshold planning quantity. The "level of lowest concern" is 10,000 pounds, indicating that only a substantial release of the substance might cause adverse health effects.

deleted from the list for the reasons explained above with respect to bacitracin.

CMA's fears concerning the delayed removal of the phthalate esters from the Right-to-Know list are similar to those recited by A.L. Labs: burdensome reporting and planning requirements and detriment to the reputation of the substances and the companies that manufacture them.

## DISCUSSION

Plaintiffs have come to this Court seeking review of the EPA's decision not to remove bacitracin and the phthalate esters from the list of extremely hazardous substances promulgated under SARA. The material facts underlying the claims of A.L. Labs and the CMA are nearly identical, and the following discussion is equally applicable to bacitracin and the phthalate esters. The justiciability of the legal questions, however, is a preliminary matter raised by the agency.

*The EPA's Action Is Final and Review by This Court Is Proper*

■ While EPA admits the subject matter jurisdiction of this Court, it insists that under the Administrative Procedure Act ("APA"), 5 U.S.C.S. §§ 500–706 (Law.Co-op.1987), the decision to defer removal of bacitracin and the phalate esters from the Right-to-Know list is not ripe for judicial review. Section 704 of the APA permits judicial review only by express statutory authority or when agency action becomes "final." *Id.* § 704. The EPA insists that its action is not final because it is currently reviewing the toxicity of these chemicals and intends sometime in the future to decide "finally" whether the chemicals are acutely toxic.

The ripeness of an issue for judicial review turns on an intuitively obvious two-pronged test. The court must determine "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). The goal of the analysis is to avoid judicial review of immature administrative decisions or policies. *Id.* at 148–49,

87 S.Ct. at 1515–16; *see State Farm Mutual Automobile Insurance Co. v. Dole*, 802 F.2d 474, 479 (D.C.Cir.1986) (avoid judicial consideration of merely anticipated controversy), *cert. denied*, —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987); *Better Government Association v. Department of State*, 780 F.2d 86, 92 (D.C.Cir.1986) (prevent adjudication until agency decision crystallized).

The first prong of the *Abbott Laboratories* test focuses on the jurisdictional competency of the court to review the agency's action. If the issue presented is purely a legal one in that further agency proceedings would not clarify the agency's position, then deference to further administrative proceedings would serve only to allow a ripe issue to rot in the frequently tedious administrative adjudicatory fora. Once the administrative proceedings have laid the factual foundation upon which legal analysis may be grounded, the first prong is satisfied. *Better Government*, 780 F.2d at 92; *Eagle–Picher Industries v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985). The court may then properly ask if the agency's action was arbitrary or capricious or otherwise not in accordance with the law.

Regardless of the jurisdictional competency of the court to resolve the questions of law, the second prong of *Abbott Laboratories* may counsel against judicial review if the consequences of the agency's decision will have no immediate discernible and significant impact. 387 U.S. at 148, 152, 87 S.Ct. at 1515, 1517. Adjudication is properly postponed when the interests of the court and agency in doing so outweigh the harm that may befall those who seek immediate review of the agency's action. *State Farm*, 802 F.2d at 480. Conversely, a party showing "immediate, direct, and significant" injury that affects his daily activities is entitled to judicial review of the allegedly offending agency action. *Id.; see Toilet Goods Association v. Gardner*, 387 U.S. 158, 164, 87 S.Ct. 1520, 1524, 18 L.Ed.2d 697 (1967); *Better Government*, 780 F.2d at 92.

Despite the EPA's vehement denial that categorization of bacitracin and phthalate

esters is not ripe, no perceptible doubt exists that the agency's action on April 22 was final and that immediate and significant burdens are imposed on A.L. Labs and CMA-member companies by that action. The legal issue for this Court's consideration will not change with further deliberation by the EPA. Contrary to EPA's argument, there is no administrative or judicial efficiency to be gained by deferring review. Finally, so long as these chemicals remain on the Right-to-Know list, those who store them in excess of the threshold planning quantity will be subject to the disclosure, reporting, and planning obligations of the Right-to-Know Act and the substantial potential fines for failing to comply with the Act.

EPA argues that for the duration of its review of the long-term toxicity of bacitracin and the phthalate esters, its April 22 action is not final. Apart from the fact that the action on that date was labeled a "final rule," the necessary implication of the agency's argument is that judicial review of any administrative action may be effectively precluded by prolonging consideration of that action. Moreover, the agency's position as to bacitracin and the phthalate esters (and the other substances proposed for deletion in November 1986) is inconsistent with the apparent status of the more than 300 other substances on the Right-to-Know list that were never proposed for deletion. There would appear to be no bar to judicial review of the EPA's classification of these substances since EPA does not purport to be reviewing the toxicity of these substances. Rejecting EPA's arguments avoids such an absurd result.

Because analysis of the first prong of *Abbott Laboratories* weighs so heavily in favor of judicial review of EPA's April 22 action, the required harm that plaintiffs must show is diminished. *State Farm*, 802 F.2d at 479–80. Nevertheless, it is clear that the EPA's decision to preserve bacitracin and the phthalate esters on the Right-to-Know list imposes reporting and planning requirements on entities that store sufficiently large amounts of these substances. *See* 42 U.S.C.S. §§ 11002 & 11003 (Law. Co-op.1987). Moreover, the potential fines for failure to comply with the requirements of the Right-to-Know Act range from $25,000 to $75,000 and may be assessed daily. *See id.* § 11045. The aggregate of these imminent and potential harms is sufficient to satisfy the *Abbott Laboratories* test.

### EPA's Refusal to Remove Bacitracin and the Phthalate Esters from the SARA List Was Arbitrary, Capricious, and not in Accordance with the Law

The power of the judiciary to set aside or compel agency action is limited to occasions when the agency's decision to act or withhold action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.S. § 706(2)(A) (Law.Co-op.1987); *see Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (scope of review is "narrow"); *American Financial Services Association v. FTC*, 767 F.2d 957, 985 (D.C.Cir.1985) (standard is "highly deferential"); *Natural Resources Defense Council v. SEC*, 432 F.Supp. 1190, 1199 n. 21 (D.D.C.1977) (arbitrary and capricious standard applies to agency choice not to take action). The Court's task is no more than to verify that the agency "examined relevant data and ... articulated a rational explanation for its action." *Eagle–Picher*, 759 F.2d at 921 (citing *Motor Vehicle Manufacturers*). That task must be accomplished, however, in a "searching and careful" manner. *Farmers Union Central Exchange, Inc. v. FERC*, 734 F.2d 1486, 1499 (D.C.Cir.1984). Agency action is infirm under this standard if it is based on "factors which Congress has not intended [the agency] to consider ... or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers*, 463 U.S. at 43, 103 S.Ct. at 2867. In the context of this case, the EPA's action as to bacitracin and the phthalate esters must have been rationally connected to the facts before it and consistent with Congress' mandate under the Right-to-Know Act.

The question for the Court's consideration is whether the agency's decision to postpone action in the absence of specific facts is "reasoned." *Farmers Union,* 734 F.2d at 1499–1500. The answer turns on the validity of the agency's interpretation of section 11002(a)(4). EPA's action cannot stand if it is not "true to the congressional mandate from which it derives authority," *id.* at 1500, or is based on an "erroneous view of the law." *Prill v. NLRB,* 755 F.2d 941, 947 (D.C.Cir.1985) (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943)). Contrary to the EPA's insistence, the Court owes minimal deference to the agency's interpretation of the statute. *Office of Communication of United Church of Christ v. FCC,* 707 F.2d 1413, 1422 (D.C.Cir.1983); *see Dill v. INS,* 773 F.2d 25, 28 (3d Cir.1985) ("[o]n questions of law, administrative judgment is subject to plenary review"). Deference is appropriate only if the agency's interpretation is reasonable and consistent with congressional intent. *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985); *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 845, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984). Greater reliance on the EPA's understanding would be proper only if construction of the statute depended on the agency's expertise.

The interpretative dispute joined by the parties raises no issues as to which the agency's expertise is enlightening. Indeed, the sole question is whether Congress intended to predicate revision of the Right-to-Know list, even to correct clerical errors, upon the EPA's determination of the toxicity of the substance involved.[4] EPA contends that no deletion is permissible in the absence of such a finding by the agency regardless of the absence of any existing or historical evidence indicating that the substances pose any health hazard. A.L. Labs and CMA argue essentially that the proscription in section 11002(a)(4) regarding revision of the Right-to-Know list cannot reasonably apply to substances whose appearance on the list is the result of a purely clerical error.

The Right-to-Know Act was adopted by Congress to aid local communities in planning for the accidental release of extremely hazardous chemicals and protecting against injury to persons and property. *See* H.R. Rep. No. 253, 99th Cong., 2d Sess. 60 (1986). The mandate in section 11002(a)(2) that the substances initially subject to the reporting and planning requirements of the Right-to-Know Act be those on the CEPP list was no more than a mechanism for expediency. There is no indication in the law or legislative history that Congress gave any consideration to the identity of substances on the list or the method by which the list was compiled. The only conclusion properly drawn from the sparse legislative history is that Congress' goal was simply to protect local communities from hazardous chemicals.

Part of Congress' scheme for protecting local communities was to prevent the revision of the Right-to-Know list until the EPA had considered the short- and long-term effects of substances proposed for addition to or deletion from the list. 42 U.S.C.S. § 11002(a)(4) (Law.Co-op.1987). EPA argues that to comply with this scheme it may not delete any substance from the list until such effects have been determined and evaluated. However, this argument is inconsistent with Congress'

---

**4.** The EPA argues that bacitracin and the phthalate esters do not appear on the SARA list because of a clerical error. Defendant's Combined Memorandum at 17 n. 7. The foundation for this argument is the mandate in section 11002(a)(2) of the Right-to-Know Act which states that the SARA list shall be the same as the CEPP list. EPA concludes, therefore, that since bacitracin and the phthalate esters were on the CEPP list and Congress demanded that the CEPP list initially be identical to the SARA list, no clerical error could have occurred.

There is no dispute that bacitracin and the esters appeared on the CEPP list because of clerical errors and reliance on invalid and unreliable data. The developers of the RTECS data base, upon which the CEPP list is based, have admitted these errors. The requirement of section 11002(a)(2) is not a decree by Congress that no such errors occurred, it is merely an expression of Congress' desire to implement expeditiously the requirements of the Right-to-Know Act.

goal in enacting the Right-to-Know Act since bacitracin and the esters did not appear on the CEPP or Right-to-Know list because of their toxicity; rather, they appear on the lists because of a clerical error or flawed scientific methods. Consequently, it is illogical to apply the precautions of section 11002(a)(4) to these substances.

EPA's refusal to remove bacitracin and the phthalate esters from the Right-to-Know list is arbitrary, capricious, and contrary to the provisions of the Right-to-Know Act. The agency's interpretation of section 11002(a)(4) of the Act is based on an irrational construction of congressional intent and is not based on the agency's expertise in environmental matters. See *Motor Vehicle Manufacturers*, 463 U.S. at 43, 103 S.Ct. at 2866; *Chenery*, 318 U.S. at 95, 63 S.Ct. at 462; *Prill*, 755 F.2d at 947. Similarly, the agency's action cannot be deemed "reasoned" in the absence of any evidence indicating that bacitracin or the esters is acutely toxic or that Congress intended to require the EPA to evaluate the toxicity of every known substance or even substances appearing on the SARA list through clerical error. See *Farmers Union*, 734 F.2d at 1499–1500. Because the EPA's interpretation of section 11002(a)(4) is patently unreasonable, deference to its interpretation is not warranted. *Riverside Bayview*, 106 S.Ct. at 461.

## CONCLUSION

The material facts in this case are numerous but undisputed. See *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (court must determine whether genuine issue for trial exists). EPA insists that bacitracin and the phthalate esters do not appear on the Right-to-Know list because of a clerical error, but the argument is at most inartful dodging of the facts rather than a genuine dispute. The argument implausibly ascribes to Congress an intention to immunize or ignore any errors, clerical or otherwise, in the CEPP list from which the Right-to-Know list was copied. Indeed, there is no evidence in the legislative history that Congress was aware of such errors. In this situation, Congress' silence conveys a clear message: by equating the CEPP and Right-to-Know lists, Congress did not intend to impede correction of clerical errors which cause the lists to be inaccurate. EPA's contention that there is also dispute as to the toxicity of bacitracin and the esters must also be disregarded as too little too late. EPA did not rely on any evidence of toxicity in refusing to remove these substances from the Right-to-Know list. Further, EPA offers only vague allegations that some such evidence exists and no reasonable jury could find from these allegations that either substance is extremely hazardous. See *Anderson*, 106 S.Ct. at 2512.

The remaining issues in this case are ones of law, and summary judgment is appropriate. *Id.*; Fed.R.Civ.P. 56(c). As the foregoing discussion explains, the Right-to-Know Act was intended by Congress to protect local communities from emergency releases of hazardous substances; it was not intended to perpetuate clerical errors. A substance as to which there is no evidence of toxicity does not belong on the Right-to-Know list. EPA's contention that it has no choice but to consider the possible toxicity of bacitracin and the phthalate esters is untenable. Were EPA to follow the congressional mandate it perceives in section 11002(a)(4) it would have to study these substances indefinitely since it is not possible to determine with absolute certainty that a substance is not toxic. Instead, section 11002(a)(4) makes sense only when applied to substances for which evidence of toxicity exists and supports their appearance on the Right-to-Know list.